Good afternoon, everyone. Welcome to the Illinois Appellate Court, 1st District, 6th Division. We're going to ask the lawyers who are going to argue today to both step up, introduce themselves, and tell us who you represent. Good afternoon. I'm Michael Scotro for the defendant's appellate, American Water Heater. Good afternoon, your honors. I'm J. Paul Derricani for the plaintiff's appellate. Thank you, gentlemen. Please be seated under Illinois Supreme Court Rule 352B. Each side has about 20 minutes for the reading argument. The appellant has 10 minutes for rebuttal. We are usually very loose about time, depending on how many questions we have. And, of course, we reserve the right to reduce it if argument becomes repetitive. Please remember to speak loudly. Our microphones do not amplify, but merely record what is being said. And please understand, we have read the briefs. We understand the facts of the case. May it please the court and counsel. Your honor, plaintiffs in this case ask this court to embrace the rule that no other court has embraced. Indeed, every court to address the issue has squarely rejected, both here and in Illinois. And that rule is this, that a hot water heater manufacturer, hot water tank manufacturer, has a strict liability duty to ensure that water at a tap does not exceed 125 degrees, based on a device, not a safety device, and I can explain that in full, but not a safety device, based on a device called a TMV, over which the water heater manufacturer has no control over its installation, does not manufacture, and, indeed, a testimony at trial revealed could be installed anywhere in the piping in the home. Meanwhile, jurors were precluded from hearing evidence about Williams, about the manual, and, indeed, about a body of devices that exist to avoid precisely the kind of stall that occurs at the tap. Your honor, there is no dispute, and there would be no dispute, that this is a tragic case. But the law is equally clear, that the liability under strict liability regime for this does not lie with the manufacturer of the water heater. Your honor, I can begin, as we do in our briefing, that we are entitled to judgment as a matter of law in this case, as so many other courts, including the Second District in Carroll, have concluded. Counselor, may I ask you a question on the NOV? Yes, your honor. It's a pretty high standard, is it not? It is. Yeah. And I think what the law says is that you have to show that there is a total lack of evidence to prove any of the elements of plaintiff's case. Can you tell me what elements of their case they did not prove here? Your honor, they have it under either consumer expectation or risk utility, and we know from the college that the two, in a sense, combine. But under either of those tests, as a matter of law, they have not satisfied, even let's take what's done with duty. If we begin with duty and we look at the existence of the TMV in this case, we have two competing lines of cases. I use the word competing, but indeed they run in parallel, and they both lead to the same end point here, your honor, with regard to duty. We have cases less thorough that we talk about in our brief, which talks about sort of independent safety devices. This would be the line of cases that prevents the notion that a manufacturer of skis or bicycles needs to include a safety helmet in the packaging, which is tantamount to the argument being made regarding the TMV, although a safety helmet, unlike a TMV, is in fact a safety device. The other competing line has to do with the distinction between manufacturers and assemblers, and whereas here you have a broader assembly system, in this case a brawler's plumbing system, the manufacturer of a component part of that system, and this is the line of cases we include, including Sparaccino from this court, that the law does not recognize a strict liability duty to include some extra part or to ensure the safety of the way the system ultimately functions on the part of the manufacturer of any given component part. That, as a matter of law, defeats liability under any theory in this case, your honor. Now, if we were to walk through it, I'd be more than happy to look at, for example, the other risk utility elements. I agree with those, yeah. This legal defect, and it's the same legal defect, your honor, that was recognized as a matter of law, for example, in Kira. Let me ask you about Kira. Sure. The 2615 motion, was it not? Didn't go to trial. Correct, your honor. So a failure to state a claim, pretty much is what that holds. So there was no mock-up, you know, like was presented in this case. There was really no evidence, experts. Right. No discussion even of the risk utility or the consumer expectations test. So isn't this somewhat different, what we can get from Kira versus what we have here? It is, your honor. Indeed, Kira ought to have been a harder case for the manufacturer than this one. And the reason is this. Kira, on the pleadings, the court concluded, and this is language from the case, from the opinion, that there are no set of facts that could be put in this case that would require this, that would, under which the court could find a strict liability duty. And the court specifically says, because, and this is what we were chatting about a moment ago, because the TLB, and that was mentioned in that case, we don't look at that. We look at the product. And the product here is a hot water heater. And by the way, in that case, a hot water heater that was producing water at 170 degrees without an owner's manual. And I would just add, your honor, to the extent we're talking about judgment as a matter of law in this case, if the court were to conclude contrary, in our view, contrary to case law from Illinois and outside of Illinois, that there is effectively a duty to include the helmet with the bicycle, to include the TMV with the water heater in this case, that as a matter of law we're not entitled to judgment on that theory, then certainly, your honor, the jury was entitled to understand things like, there's a universe of products out there designed specifically to avoid scald at the tap. They weren't allowed to hear meaningfully about those. But you're saying on this issue, there was testimony in the record about the stacking, that when there's some sudden use of a lot of hot water, we all know like when I run my dishwasher, guess what, my shower suddenly gets much hotter than it normally is. Doesn't the stacking make the hot water heater unreasonably dangerous, or at least for purposes of our appeal, doesn't evidence like that, that's in our record, defeat your claim as to judgment as a matter of law? Absolutely not, your honor, and for two reasons. The first is, we have statements made during even opening arguments in volume 34, I believe it's page 55, we have statements being made by the plaintiff's attorney, we're not challenging the water temperature as it came out of the water heater. But even if they were, the other and I think more profound reason that stacking is not an issue in this case, your honor, is that everyone to testify, Thompson, Hulsey, George, Adams, all four experts to address this issue concluded that the temperature that came out of the tap, and the tragic incident in this case, was no hotter than 155 degrees, precisely the same on the hot water heater in the basement. And so there is no testimony. In fact, all the testimony is directly to the contrary, which is perhaps why ultimately plaintiffs did not challenge the heat as it came out, because there's no testimony to suggest even a degree of stacking. Indeed, the police expert who then came, well not expert, but the police officers who tested the water, concluded it was 138. The experts ranged from about 138 to 155, but it was set at 155. And your honor, I should add, it reminds me of a point. The fact that this was set at 155 ties into something about TMVs. TMVs also have to be set. There is testimony that often they're set as high as 145 degrees, well within the range that experts said was at issue here. One of the witnesses, Hulsey, even said he's seen them as high as 160 degrees. And so the notion that the TMV, which is intended to allow for two streams of water at different temperatures, is somehow a safety device, it defies logic. You would have to set it in the same way you would have to set the thermostat on the hot water heater. It's simply a redundant process where now you have to set one instead of the other dial. And this one may be harder to find. Yes. Thank you. You want to set up a situation where your product is something similar to operating a bicycle and you also should not be required to have a helmet. But that doesn't seem to compare to your situation. If a person is riding a bicycle without a helmet, there is no certainty that they're going to get injured. There has to be an intervening event to cause that injury. So a person can ride a bike, operate a bike, without a helmet, and not be hurt for months, years, whatever. It requires an intervening event. Your device, or your water heater, rather, without this valve, will cause burns, just as existed in this space. Without that device, an intervening process like this, without that device, your water heater is going to cause damage. Therefore, doesn't the manufacturer have a responsibility to include to have that on there so that the product is not unreasonably dangerous? Thank you, Your Honor. The answer is no, and let me explain. Product liability law, in Illinois and elsewhere, is very clear. The intent is not to place all of the risk, all of the potential burden of a potential injury on the manufacturer of any product or, indeed, any component part of a broader system, as was true in this case. There were items like anti-scald devices that one could purchase to prevent scalding at the fixture. This is just like so many of the cases for involving the safety glasses without the side protectors, and some of the others where you have devices that were dangerous without other protections. The theory there is that you have a device that has to be used under all sorts of circumstances. There was evidence in this case, some excluded the copper. Others, the other portion that went to the jury, showed that up to 160 degrees was common, and the reason that hot water heaters do that is because there's a need for dishes, for legionella, so it could exist within the plumbing system. This was excluded, but copper, under 158 degrees, it can breathe within the pipes. So they're making this product, and many cases talk about it in this term. They say, what is the nature and function of that fundamental product? Even if it could be dangerous, how does it interact in the broader system? In your honor, here, what was needed, the intervening, it was set at 155 degrees, and there were no anti-scald devices used, and so there were words on the side, again, excluded from proper view by the jury that said scalding begins at 120. There was a diagram next to the dial, again, not clearly visible to jurors, but showed where certain hash marks, including 120, were on the dial. All of that, and warnings that said there are mixing devices, anti-scald devices available, and that one should consult the manual. So there were things that prevented this from being in danger, but, tragically, none of them came into play, and our viability law simply recognizes that, yes, no product is perfectly safe, but the manufacturer has to make something that's not in reasonable danger. What's the temperature setting when it leaves the thing? 120, your honor, the lowest setting. And what is necessary to do to increase the level of temperature? Your honor, as I understand it, you're merely turning the dial. Like I do when I go down to the basement on the water heater, I have a dial. It starts very low, then gets all the way to very high. And there's nothing restricting me from going to very high. Nothing whatsoever except my will to turn that dial. It'll move. So when your product leaves the factory, is that temperature control easily moved? Is it easily set to a higher degree? One would move the dial to set it to a higher degree, your honor, but the same would be true. They have not challenged. There was no jury instruction on a confusing dial or anything like that. Nor have they challenged the ease with which one can. That was not the theory of an alternative device. The theory is that somewhere else in the house, maybe close, maybe not, to the water heater, there has to be this device that's intended to split water temperature. This should serve as a de facto safety device. But it, too, has a knob that adjusts somehow. I'm not even sure, frankly, how. But you have to adjust the maximum heat on that as well, your honor. As I said, there's testimony saying that some of them go to 145, and in one case, Halsey indicated he's aware of one that went to 160, in excess of the temperature that was at issue in this case. Let me ask you about TMV. Wasn't there evidence that a TMV is provided in some of your products that go to Canada and not to the U.S.? Yes. Not that it was provided in some parts to Canada. It was provided with the Polaris model. Yes. If I may, I have two distinct issues. So with regard to the Polaris model, this was a model unlike ours. And I'll be happy to address the dual-use issue. It was marketed as dual-use. It's not to say that it's very easy to get things just certified as dual-use. The requirements, as the record shows, is just you have to have some labeling and manuals that says, here's what you do in the case of a dual-use. In Canada, there was, and we don't have the actual code, but there was testimony. They use ANSI code? I believe it's not. I believe it's different. I may be correct. Perhaps I'm wrong. There is a code. But my understanding is with regard to the only testimony with regard to the Canadian code is that what it requires is TMVs. This is a clearing issue, that they should be installed in the home. It is not my understanding that the Canadian code requires the manufacturer to produce a product that includes a TMV. Well, would you consider that a component of the TMV goes with the water heater? No more than batteries included in the package or filling the bicycle with a helmet. That's certainly something one can do. When we marketed our Polaris model, putting the Canadian code to one side, and we marketed the Polaris model, the idea there was we were specifically targeting folks who wanted to use this particular model to do both space heating and portable water use, and you have to have a TMV just as a matter of physics because you need them two different temperatures going at the very same time. All right. There was no testimony relative to anti-scald devices at the trial, though, correct? There was. My recollection is there was nothing but a passing reference to anti-scald devices. There was testimony that we had proffered. On July 26th, there was a documentary proffer that included an evidentiary deposition by Ryman Romling and one of our experts. He would have testified about, look, we have anti-scald devices. Here's what they're for. If I could just add, another piece of evidence proffered but not admitted was an actual regulation by ASFE, a safety organization, and with regard to TMVs specifically, and this is in the record because it was proffered, they say these should be supplemented with point-of-use anti-scald devices to prevent scalding. So even they recognize the TMV is not here. Don't rely on that as your safety device. That's your to split water into two temperatures. All right. Counsel, let me go to a different area, if you would, please. The area of strict liability, we don't see it every day, even in the trial court. There's many more just regular negligence cases. Are there not? You agree with me on this. It's a unique area of law. So this being a jury case, the jury should understand every bit of information they can understand to come to a just verdict. Do you understand that? I do. Okay. In looking at the jury instructions that were given in this case, there was one that was given. It's 400.06A, which talks about strict liability, definition of and reasonably dangerous. And then there's a dash that says risk utility test design defects. Yes, correct. Now, consumer expectation is a one-component test. Yes. And the risk utility is sometimes five, sometimes seven, but a multidimensional test. Yes. Okay. When you read this jury instruction, I was surprised to see that they call it risk utility, but the first part of it has to do with the consumer expectation test. Yes. And the next part kind of sort of goes into risk utility but doesn't list any of the factors. Now, what I'm concerned about, we know the law, you folks know the law, trial judge knows the law. The jury, what did they use to find whether or not these tests were complied with as far as jury instructions? Yes. I think this was, my sense of it, your Honor, is that this was the kind of megalogic, if I'm pronouncing it correctly. I understand what that is. It's a megalogic kind of combined test, because you're right, there's no question that it includes an element of consumer expectation. I think that, I mean, from our perspective, the best way I can answer your question is even with that instruction, not only does it lack the elements, but what was withheld from the jury here was significant. Everyone agrees. Are you talking about the special interrogatory now? Well, I'd like to, and maybe I'll shift to that, but I really meant, I mean, with regard to evidence that was not before the jury, so if we're pivoting to a world in which an answer is not as high as a judgment as a matter of law, consistent with what we believe to be the unanimous view of other courts, by turning to what was omitted from the jury here, they didn't have the manual or the warning labels. And megalogic is one of them that says, look, when you're applying risk utility, warnings are critical, not because you're trying to blame the individual in the case. And this is why they were excluded. There was a theory that by showing warnings, by showing the manual, you were in some way suggesting that the individuals here were contributory negligent. No, the reason that the Illinois Supreme Court demands that jurors get to see those is because it's part and parcel of defining how easy it is for consumers with this product to avoid injury. It's important for understanding what the reasonable consumer expectation, the objective test is. There's an argument that the actual hot water heater was presented, you know, before the jury, and the water heater itself had the warning labels on it so they could see them. Yeah, it was presented. There was a photograph of the water heater at issue from a distance. It was not an up-close, readable version of the warning labels. And the demonstrative, which was not the actual water heater from the home, but another one I think that had been scrapped and was then retooled, did have the anti-labels. But, again, at a distance, there's no suggestion in this record. And, indeed, it's contradicted by failed efforts by Defense Counsel to introduce a series of legible photographs, all of which were proffered in the documentary, and all of which appear in the record on appeal. Those photographs, if you compare those to the photo of the demonstrative or the photo that was admitted regarding the actual water heater, the contrast is unimaginable. You might see that they're brightly colored. You can see perhaps you can make out a hand, which is part of the anti-scar warning. But the fact that it says expressly where the temperature hash marks are, what is 120, for example, the fact that it recommends reading the manual, the fact that it talks about anti-scar mixing devices that could be available to prevent scalding, the fact that 120 is the scar level to be careful of, all of that is illegible from what we have in the record, Your Honor. And, of course, the manual repeats all of those things. What was the trial court ruling on not letting the manual go in? So the manual was part of Motion Illumina No. 17, which is titled, To Bar Evidence of Water Heater Warnings and Manual. They actually, so the theory behind it, I'm remembering the argument, it's in Volume 33 of the record, I believe the argument surrounding that was that the manual, like the labels, that the manual would be indignant that, A, the case, there's no evidence they had read the manual, but, again, they're tallies. It's an objective test, so that would be immaterial. The other argument, as I recall, Your Honor, is the one I mentioned a moment ago. Namely, it would suggest that the family, in this case, or other individuals were contributory negligence. And, of course, what- I think that was the concern. I think that was the concern, Your Honor. I think that, and, again, non-delegation was another doctrine that was over-read during the Motion Illuminate process. That was used to eliminate, for example, any testimony about the mixing valves, or, I'm sorry, the sort of anti-stall devices and the difference between anti-stall devices and mixing valves. If I could give you another one example of that, just to show you how narrow the letter was being presented to the jury. During one exchange with the witness, the witness was asked if they had ever evaluated the cost of a TMV. This was part of the risk utility and how that would be. And the witness says no, because those were considered part of the plumbing system. That is drawing the very distinction we started today with between the item itself and other items in the system. There was an objection on the grounds that this was getting into a non-delegable duty merely by mentioning a plumber and the fact that they would be involved in that process. And the objection was sustained and the statement by the witness was stricken. Excuse me. Counsel, you're raising an issue that the jury never saw it. They never received the warnings. According to the FLE's brief, the entire ANSI manual was admitted and given to the jury. And that manual does contain the warnings on page 150, which were admitted and discussed during the months of the exhibit. Your Honor, the fact that it was available to the jury was available. They possibly considered it. Your Honor, you are correct. The ANSI manual was provided to the jurors. It's 208 or 209 pages. And they were told that the water heater in this case, there was testimony that it complied with ANSI. But they would have had to then go through the process of finding page 150 and concluding that this was on the outside of the water heater. And even more importantly, Your Honor, even more importantly, the defense was not permitted to argue the importance, the doctrinal relevance of the fact that these warnings were available in the manual, that they were available on the exterior of the hot water heater. By the way, this water heater is delivered. Again, I'm picking this up from your phone's brief. The control unit, there's three settings, hot, warm, and vacation. Yes, Your Honor. Okay. And if I'm hot, that water heater is going to throw out water 160 to 181 degrees. Correct? No, Your Honor. It is to put out water that is 150 to 160. It was on the L in hot, which is the middle, which is how they divide 155. The 180 figure, Your Honor, so I should say yes and no, it's not intended to put out water above 160. If there was ANSI revelations allow for stacking up to 30 degrees, that's considered permissible stacking. So if you use that 30-degree ANSI number, you can say that hot could, in theory, if you had it set at 160, could go up to 160 plus 30, 190. Again, however, there's no evidence in this case, indeed, all of the evidence is squarely to the contrary of any stacking as a phenomenon in this case. I'll ask the court if there's further questions. Thank you, Mr. Schovanec. Thank you. Could we allow another couple of minutes? Of course. I would be happy to address probably what I think is your strongest issue. I would love to address the special auditorium. Thank you. The special auditorium, the rules are very clear on this. There is no discretion so long as they satisfy two requirements. One, that they relate to an ultimate issue of fact, and the other is that the answer hypothetically could be inconsistent with the general verdict in the case. That's set forth by this court in Thomas in 2003, and that's the general Illinois rule. Here, the special auditorium could not have been clearer. Quote, was the water heater designed and manufactured by American Water Heater Company in 2005 and reasonably dangerous when it left its control? The only answer the court gave, and this exchange, as you'll see in the record, is extraordinarily brief. It's in volume 36 of page 142. The court's answer is, quote, not a specific stated element of the current burden of proof instruction. Of course it's not part of the burden of proof instruction. This goes directly to an element of strict liability, and indeed, in the plaintiff's brief, they don't pretend to defend the circuit court's rationale. Rather, they say, well, the word manufactured might be confusing because this is a design defect case, but, of course, the way it's being used is it was designed and manufactured by American. That's phraseology of the court itself that we've come out of. Designed and manufactured means for that specific interrogatory to apply. They must both exist. It's not disjunctive. It's conjured. Correct, Your Honor, but there was no disjuncture here. First of all, the interrogatory must not be ambiguous. Correct? Correct, Your Honor. And we have as a given that this is not a manufacturing defect. It's a design case. So to include in the specific interrogatory that it must include manufactured and designed, doesn't that make it out of space and ambiguous? Not at all, Your Honor. It's defining, it's describing which item is at issue, and there was no dispute in this case that there is precisely the water heater. Designed and manufactured is the water heater that's at issue in this case, Your Honor. It was simply identifying the item. Now, there's no potential second water heater that I think any member of the jury would have. The jury not having heard any evidence whatsoever as to a failure of the manufacturing process, in order for this specific interrogatory not to be ambiguous, including manufactured where there's no evidence was presented, wouldn't that be error on the court's part? No, Your Honor. In fact, as we show in our brief, in our reply brief, the court itself referred to this as an item in the jury instructions manufactured by Americans. So there was no ambiguity in using that term. It was simply a very precise way of identifying the item that's at issue here. And again, this wasn't the court's explanation. This is a post hoc explanation provided only in the briefing on appeal, but even that falls short. Again, there's nothing ambiguous. This was the only water heater the court could conceivably have been describing in this case, Your Honor. Use of the word condition as opposed to unreasonably dangerous, again, that actually would have thrown confusion into it. That's a suggestion made in the brief of the plaintiff on appeal, but there's no discussion of what condition means. They're just using the term of honor that the cases use, unreasonably dangerous. And finally, there's a third explanation provided in the briefing on appeal. This has to do with, in a sense, there's a compound question being asked, but as we show, there isn't. And the state's filing case from 1990 includes a very similarly worded, similar syntax, and there was no concern there, and indeed it resulted in a reversal on appeal. Thank you. Thank you, counsel. Mr. Duratani. Thank you. I'd like to start out with a duty argument. The appellant in its reply brief specifically and then throughout this argument today would like for this court to grant blanket immunity for water heater manufacturers, for any liability. If this court were to file a defendant's rather, I would say, misinterpretation, but certainly a strenuous interpretation of case law, all manufacturers of water heater would be immune from liability. But that's not out of law. Where a company has designed a water heater with a thermostat that produces water so hot that it will burn or kill somebody within a second, even when set at the lower settings of warm, or at least within a minute, they cannot be considered immune from liability under our law. They would like immunity, blanket immunity, even though both of the defendant's experts, not our experts, or not just our experts, but their experts, stated that industry standards required a TMV on this type of water heater. Counsel, can I ask you, what's the temperature at which skin burns? Well, temperature at which skin can burn is time equivalent as well. So at 120, about 125 degrees, it might take about, and I don't have the burn meter in front of me, but about 5 minutes, 10 minutes. When you get to 130, but, you know, at that time. And what do they start at, usually, the hot water heater, as far as temperature? I think they start at about 115, 120 degrees. Yes. What we would do is say that a hot water heater is only safe if it's between 115, 120 degrees. Is that what you're suggesting? No. And I think the defendant has it incorrect when he said that, you know, I admit that the water heater has to be a certain temperature. A water heater can be any temperature. It can be 170 degrees in the tank. What we're saying is when you combine a thermostat, which surely is defective, and which we allege was defective in the sense that it had a temperature that, even on the warmest setting, with scatching, can cause burns within seconds. But what we stated at the trial level is, look, if you're going to have that, then at least, at minimum, you have a temperature mixing valve, which the defendant is also incorrect because when he says that it's not an anti-scald device, our experts clearly indicated it was an anti-scald device. A look through the record would indicate that it's identified, that some of the documents identified it as an anti-scald device. So it's way too simplistic and really untrue to say that it's simply a device that diverts water. That's not the case at all. Do you agree with your opponent's position or assertion that we'd be the first court in the country to declare water heaters inherently dangerous? You know, I didn't look through every case in every courtroom, but I don't believe that that's true. I do think that if we were to look at, you know, let's assume that it's true without looking at every case. At some point, the case law had to say the windshield wipers on a car had to be deemed an integral component part of an automobile, or same with airbags, same with safety belts. But that's really not what we're talking about. This case is very much like the Supreme Court of Callis v. Scripto. And, of course, it would be very obvious and very easy to take the defendant's analysis just like in this case and try to apply it to Scripto and say, well, if you light a lighter, a flame is obvious. Water is obviously hot. And I understand that argument, but it suffers from an oversimplistic and not legal application because the risk utility test, which was announced in 1965 in the Savannah case and really went on from there, says a manufacturer is duty-bound to adopt all devices, and that goes to even a device which you might say is on the outside of a vehicle, such as windshield wipers, all devices necessary to make the product not unreasonably dangerous. And the court was very careful to say who it is that makes that judgment, and that is the jury using those five or six factors that I think Justice Connors pointed out. Well, here's my problem with counsel. To decide whether or not that was unreasonably dangerous, they would have to know the aspects of the risk utility test, would they not, the jury? Do they ever hear those aspects? Let me ask you the first question. What's your method of proof? Are you relying on the consumer expectation test or the risk utility test or both? You know, I hedged my bet in this case, and I relied on both, and we presented evidence as to both. We had three experts, and we used the risk utility and the consumer expectation test with primarily Wendy Shields for consumer expectation. And we met those proofs by overwhelming. But my point is, the jury, what did they hear as far as their instructions as to what they were to consider in coming to the determination of unreasonably dangerous? They didn't hear the components really of either test. They had one jury instruction, 400.06, that combined kind of the two tests and didn't really give them a full flavor for what the test is. Isn't that right? I wouldn't say that, and I don't believe that the defendant objected or even appealed. I understand, but as I said to your opposing counsel, the lawyers knew what the tests were, the judge knew what the tests were, but the fact-finders didn't know what the tests were. I think that they did, in a sense, in a broad sense. Could it have been more detailed? You know, we could certainly redo jury instruction and make it more detailed, but I think the jury considered, and when you look at all of the issues in instruction in their entirety, what the jury was told was look at all of the facts and evidence, and you must determine, and then basically the survival instruction is there, which says basically you must consider all of the facts and evidence to determine whether a product is unreasonably dangerous. Do they know what specifically to consider is my question? Not really. I think they did through both argument and an overall reading of the jury verdict. Do I agree with Justice O'Connor that if we were to go and map this sort of setting and say that we can make these instructions a little better? Sure. But for purposes of this case, they did have the instructions, and they were told what product liability means and how it's defined and so forth. And again, the defendant didn't object on that grounds, and so there is an objection there. I understand. But here the jury weighed whether the water heater with a thermostat, that thermostat that misleads the public as to temperature is unreasonably dangerous without a TMD, and they said no. Counsel brings up Weston House, and I think Justice Harris brought up it wasn't a negligence case. I'm sorry, it wasn't a product case. It was a negligence case. And as the court in Savannah said, a court can't use the analysis of whether conduct is reasonable using a negligence standard. Interestingly, in the Carroll case, which was also heavily relied upon by defendants, I wanted to quote something that the court said there. The plaintiff drawing water from a bath would have no reason to believe water coming from a faucet would be heated to such a degree as to cause instantaneous injury. And that's what we're talking about here. So whether or not, if there were any other cases, I'm not sure any other water case has actually had a thermostat that had to be set on vacation, which it was well established in this case, the only way you could actually get a safe water temperature with this American water heater product was to have it on vacation. And obviously, using the consumer expectation test or risk utility, but specifically the consumer expectation test, how could anybody objectively think that warm water would mean warm water? Or even if you wanted to say that the photographs from the police a couple days later must be what the temperature was set at, which counsel is saying, which is hot. It doesn't. Hot doesn't mean hot. It means cold within seconds. Let me ask you about the altitude design that you proposed. Did you show that that was a feasible design to the jury? It was demonstrative because an infendant pointed out and argued at the time that the water heater couldn't operate. Well, of course, it's in a courtroom, so it wasn't going to operate, and it couldn't be subjected to it. And the biggest argument was it wasn't subjected to the ANSI test. Well, of course not, because our expert's putting it together for demonstrative purposes. So it was merely to show where a TMV could be installed and how easy it is and what it does. Was it installed properly, 8 to 10 inches? Yes, we believe it was. I think our expert said they didn't approve that, and one of them said that it wouldn't have passed the ANSI standard. Our expert says it would, but it's not designed, we're not doing it for that purpose. It's merely to demonstrate what a water heater looks like with a TMV and how close it is. To revoke, by the way, the extensive argument that whether motion to eliminate were granted in this case or not, the defendant, as a court, said at one point through the record, it seems like you're going outside the motion to eliminate anyway. So, and I wanted to also, I think that water heater is important because you brought up warning labels. There was a warning label, the exact label was on the water heater, standing within three feet, and it's reflected in the record, from the jury. So for CASA to say that the warning labels weren't there is simply incorrect. Well, they didn't take the thing back into the jury room, I know. No, they took the ANSI standards, as I think Justice Swearer said. But they didn't have the label, and who knows who was able to read it from that justice? Well, CASA, we'd have to read through the record, but it was CASA pointing it out, and then it was also put on the overhead. So I don't understand, isn't this reflected in the record? The warnings. What's that? The warning itself. Yes. So we have, it went back to the ANSI standards, and CASA points out that the ANSI standards are a large work, but as the court, the trial court pointed out, it's up to CASA to decide which pages he wants to accentuate or talk about with regard to cause and argument. The only thing Judge Schneider said in this case was, you can't use these standards to, or the warning labels, for evidence of contributory negligence, which is perfectly consistent with the DeMasa case and the Tucker case, because in those cases, none of those cases, a child put a dart in his mouth, and no one saw him putting the dart in his mouth. And they said, well, it doesn't matter what mother's conduct is because we look at the product, and that's what's so important about Illinois law that I think the defendant unfortunately doesn't appreciate, that the design of Savada, Rios, and all of the cases, it's designed to look at the product itself and determine whether that product is unreasonably dangerous using a consumer expectation risk utility test, and the duty of the manufacturer is unfettered to produce a reasonably safe product. Mr. Tarantino, let me ask you to respond to the other side's argument that you can't consider the hot water heater by itself, because a hot water heater just sitting, you know, in an open room, not connected to anything is meaningless. It's intended to be connected to an entire plumbing system with pipes and faucets and travel through the house, and they make an argument that you have to consider the entire system and that it was inappropriate to take this to the jury just on the water heater itself. Justice O'Connor, I understand the point, but to say a TMV is not part of a water heater is equivalent to saying an air bag, a safety belt, or windshield wipers are not part of a car. You know, it's not. They can't go to the argument. They wanted to at some point go to the argument that end-use products, in other words, that a consumer can put a product on our and because of our economic position, generally I would bet all of our showers have a stop switch, a stop gap, and they were produced in whichever condo or home we live in by the builder or by the landlord, but in poor homes they're not. But the point that they wanted to make was that you can simply go out and buy something or have something installed by a plumber, but the case of the Supreme Court rule said it is a non-dedicable duty to make this product not unreasonably unsafe. In this product, we're looking at the TMV, which is attached to the outside of the machine within those couple of instances we pointed out, just like all of the other 27 components of that machine, we have the water feeder, makes up the entirety of the machine and is required to make it reasonably safe. So, you know, Council brought up pallets on a bike, and Justice Harris correctly pointed out it is a different thing because it's, well, first of all, a safety helmet attaches with the individual, not a product, and it's not a part of the bicycle. This, however, a windshield wiper, for example, is part of a vehicle, and to say a windshield wiper is not an integral component part of a vehicle would, of course, be ludicrous, but we use that example. I think that windshield wipers and airbags are, I would think they're required by federal law, so we don't have an option of a car manufacturer to exclude them from the product. I'm not here where we, I think the record seems to indicate that very few, if any, water heaters in America are installed with the TMB. Actually, quite a few water heaters are installed, and you're correct, Justice DeLore, the automobile manufacturing is so tightly regulated, a lot of that is within the regulation, but here, too, we've heard, the jury heard expert testimony, not just from our expert, again, from the defendant's own expert that admitted that an ASS 1017 is required on a dual-purpose water heater. So it was a, it was, at minimum what they said, they admitted it was industry standard, and then our expert said it was not just industry standard, but it was, in fact, required under the regulations. A dual-purpose water heater is to have heat water for potable use and for showers and things, and also for hot water heating of the actual garage, correct? Yes, sir. And that is not, the water heater at issue here, this home was not heated by hot water, is that correct? There's no evidence that they used it, that this particular, that Jennifer and Brian King used it for that purpose. But there's a distinction, I think, without validity, because the standards whether the product is safe and the standards of whether or not the statutes or regulation or industry standards require something doesn't depend upon what the end user uses it for. It depends on what it was when it was manufactured. And I think what's important here is it would be equivalent, again, to say, you know, use a car, for example, is something we all use so often, but a vehicle in Arizona that doesn't have windshield wipers because we don't have that many rainy days in Arizona. So you can't say that it was a dual-purpose water heater and therefore we didn't have to follow the regulation that was required or the industry standard. The jury heard clear, convincing evidence from our experts and even admissions by their experts under cross-examination. Much of our case was, in fact, made by their expert testimony conceding so much of this. Their experts said that you must have a TMD? The TMD is industry standard for a dual-purpose water heater. Dual-purpose, yes. Yes, yeah. Now, we talked about the special inter-auditory. Yes. What was the objection that you made to that being given? If you asked me the special inter-auditory today, right now, was a water heater designed and manufactured by an American water heater in 2005 unreasonably dangerous when it left its control, I would say no. What you objected to that being submitted? The basis of the objection is the standard is it attempted to sort of combine two or three jury instructions that don't apply or two factors that don't apply. It's not whether it was unreasonably dangerous when it left the control of the manufacturer. It's whether the condition existed. And the first part of that analysis is so important because it's usually when the defendant contests that a, you know, the distribution may have interfered with the product. So if you produce something, the TMD could have been altered by somebody down the road by the end seller. In this case, they admitted there should be a stipulation that the TMD was in the condition that it was and was distributed outside, was not distributed in the box. I'm sorry, I said that wrong. That the TMD was not in the box. It wasn't unreasonably dangerous. The question is whether. The water heater, not the TMD. Right. The water heater wasn't constructed yet. It came in 27 component parts in a box. So when it left the manufacturing facility, it's certainly not unreasonably dangerous. I think the court, and by the way, the court did not state what the court meant when I was there. It was pretty clear. What did it say? They said the instruction. They said the burden instruction. Clearly, I think reading the record, the court meant to say the issue instruction doesn't comport with what it says. So here's the point. On its face, it doesn't make sense. Because a jury could go back to the jury room and say, well, look at the special interrogatory. This water heater wasn't unreasonably dangerous because it wasn't producing water and it was in several parts. And by the way, maybe the end user could look on it. What they needed to do is break it up into two questions. That the condition of the water heater without a TMD exists at the time it left defendant's control. And after assembled, without a TMD. After it was assembled. And assembly is so important here. Without a TMD, where's the water heater in an unreasonably dangerous condition? And it's not even dangerous. I presume that you prove this capability of design to put the TMD in the special interrogatory. I'm sorry. Isn't that taking it a step further? I kind of presume that you proved that this TMD is an electrical part and is a safety thing that needs to be on it. That's not what their argument is. I don't understand why the TMD part should be in the special interrogatory. Well, because our allegation is that without the TMD and with the control, the temperature thermostat operating the way it was, it was an unreasonably dangerous condition. Or unreasonably unsafe condition is actually the standard. The question is not whether when it left the control of this manufacturer it was unreasonably dangerous. Is that not the question? No, because it's not dangerous when it left the control. And it may sound so simplistic, but the jury could literally think, well, it's in a box, and there's no water in it. So your argument is that the special interrogatory was improper. It seems to be based, let me finish. I'm sorry. Okay. That you think the jury would have thought they were being asked whether this hunk of metal is by itself sitting there unreasonably dangerous. Of course, what Judge Snyder is asking us to consider is whether or not the water heater was connected to water pipes is unreasonably dangerous. And all put together. So they may think that it's not put together yet, and they may be able to step further and say, Was there discussion of the jury instruction at all? What's that? It's not put together? Was that even discussed during the jury instruction conference? A lot was discussed on the record, unfortunately. And I could talk about that, but I know I'm not allowed to talk about what was on the record. What is on the record is consistent with the case of Bernardi v. Chicago Steel. Where it's confusing or misleading in the least, then the instruction must be rejected. Now, the instruction, in reading the whole thing, then the court was careful to say, This instruction is rejected, as is. They weren't rejecting all possible special interrogatories. And Hadley worded it correctly. It's not the law that it must be unreasonably dangerous when it leaves the facility. That is not the law. Then what is it? The law is that the condition exists at the time it leaves. Not having the TMV. Not having the TMV. And then, was it unreasonably dangerous when it's put to its use? And that's so important because the jury's got to rely on it for that. The jury's got to rely on it for that proposition? Yes. Well, it's in the jury instructions, but I think without a... Well, but Rio's concerned about it. If it's a non-delegable duty, which Rio says, we don't want to imply in any way to the jury that somebody else could go buy a TMV and put it in its... Was there any jury instruction on non-delegable duty? No, I'm just stating what the law is with regard to... I know, but what they were considering. Oh, yeah, there is a jury instruction. Was it given? What's that? Was it given to the jury? Yeah, non-delegable is part of the issues instruction. And it's mentioned somewhere. And, listen, I don't want to be mistaken on it. It's my firm belief that it is within the issues instruction product liability, that it manufactures a non-delegable duty. That's true. But it really is important, and there's an important distinction, that the condition of the water heater, the question was really it was supposed to be designed to determine if somebody in the distribution line changed or altered that TMV. And that is what they were trying to put in there, and then we combined that with the specific stipulation. But they not only stipulated, and it was read, but they stipulated that the condition existed at the time. In other words, it left the manufacturer without a TMV, so they don't disagree on that. Then they want to say it must be unreasonably dangerous at the time it left the manufacturing facility, leaving its control. That's changed a lot, and it may seem like a silly distinction because you think, well, of course the jury has to assume it's put together and the water is going through it. But given what we know about what can happen down the distribution chain, it's not silly. It's quite logical that you wouldn't want to say it's unreasonably dangerous at the time that it left its control. You would want to say the condition without the TMV existed at the time it left the control, and then it was unreasonably dangerous when assembled and put to its use. That would be the standard. To do anything other than that would be confusing and misleading, which Bernardi v. Chicago Steel says it must be rejected. It probably would have been duplicative had they done it right on the jury instruction, but that isn't the primary problem. They didn't do it right. They had to separate out conditions from assembly in a situation like that, or it would actually misstate the law. I don't think I pointed that out correctly enough in our response brief, and I apologize for that. Counsel, let me ask, let me pivot to something in your opponent's brief where they rely on the WNET case. Illinois Instrument Corp., which is, of course, our boss, WNET case says, they say the case stands for the proposition that accidents involving product misuse by small children are not reasonably foreseeable and therefore cannot support claims of strict liability. Do you agree that the case stands for that proposition or how do you get around that here? Well, I don't think foreseeability was an issue because they admitted, actually Mr. Adams admitted that the child used, in this case, Michaela used the water heater for its intended purpose, and then repeatedly I would ask him it was brought out throughout expert testimony and so forth that the bathtub was used for its intended purpose. I don't think the WNET case would apply to this at all because you can't immunize somebody from liability even if there is a misuse of the product. In other words, you have, in the WNET case, according to their brief, a four-year-old child approached an operating farm wagon, of course the four-year-old is not going to be operating a farm wagon, and placed her fingers in the hole of a moving screen. And Illinois Instrument Corp. apparently said there wasn't grounds for liability. And I believe that they were encouraged to do that. And there was some question of encouragement to do that. So it did take it out. It wouldn't be reasonably foreseeable that that happened. And that, first of all, they never applied, appropriately applied, unforeseeable misuse, which would have to be a standard that they would have had to apply. Are you saying that this is an affirmative defense they should have applied? Well, it not only was an affirmative defense that they should have applied at the time, unforeseeable misuse, but they didn't have any evidence of unforeseeable misuse when they had multiple of their own experts basically indicating that she used the hot water heater for its intended purpose. I asked the question, did she use the water heater for its intended purpose? The answer is yes. Did she use it for its intended purpose because it was used to draw a bath? That's right, Ron. In that case, encouraging somebody to put their hand in a farm equipment is a totally different thing. But, again, we look at the DeMaso case or the other case where the child was playing with matches. I'm sorry for the name. DeMaso and Tucker. The Tucker case where they're playing with the matches and the mother sees the child playing with the matches and sees the child, in the other case, putting the tip of the dart in her mouth, and that is barred. It might seem counterintuitive that that evidence should be barred, but the reason is, and it's rightfully so, that the courts have repeatedly said from Travada on down that we look at the product itself. Is the product inherently or unreasonably dangerous or unreasonably unsafe given its totality and considering the different factors? And that's where we must land. The jury heard this case over the course of two weeks. They considered all of the evidence, and they reached the correct conclusion. There was nothing about the labels. First of all, the labels were all admitted. There was nothing about the labels that were not admitted. The jury instructions were not perfect, and the standard certainly is. And I agree with Justice Connors. We can work on that, and maybe there should be a new IPI for that. But as it is and as it was today, the jury was allowed to consider all of the evidence and reach the correct conclusion. And I think what's so important is that when a manufacturer has a non-delegable duty and his duty is to adopt all devices necessary to make the product not unreasonably unsafe, under the Calus versus Scripto analysis, it is to be determined by the jury and not the court. Any other questions from the panel? Thank you. Thank you. Counsel, I'd like you to address the unreasonably dangerous explanation as far as what the standard is here that your counsel's opponent suggested, but go ahead with whatever you want to say. Oh, sure. I think, yes, thank you, Your Honor. I'll try to be brief and address points that were covered. I do want to very quickly dispose of this idea. It was stated again here in the briefs that the code required a TMV to be included because the data plate said this could be used for dual use. Again, that is a complete red herring. As the testimony showed, all you need is to satisfy some ANSI standards regarding labels and instructions to say that you're certified for dual use. And the testimony, and I would direct Your Honors to Record Volume 36 at pages 7, and again at page 50, where the testimony is quite clear. You only have to use a TMV if you are plumbing for dual use. And, of course, that's just a matter, again, of physics because you're going to need two different temperatures going at exactly the same time. There was some discussion again that the word anti-scald is sometimes used loosely to refer to multiple kinds of devices. Again, I would just refer Your Honors to something that was proffered, but again not seen by the jury in Volume 29, page 7232. This is where you have the trade standards that say, talking about the total mixing valves and saying use these with point-of-use anti-scald devices if you want to avoid scalding. The talk about windshield wipers and so forth, and I hope this addresses your question, Justice Connors, as well, but this idea that there's windshield wipers and other things, that makes our point precisely. Those are all things within the control of the manufacturer. It comes out of the factory with the windshield wipers, with the headlights, with the seatbelts, and so forth. This is like the case of VASL, which we cite. Again, this goes back to this idea that there's a distinction between the sort of underlying nature and function, to use this Court's words in further. But in VASL, you're talking about doors that open and close and the systems that are used to open and close them. And much like a bicycle helmet or the doors in VASL, what we're talking about here is taking a water heater whose nature and function, in Fuller's words, is to produce the hot water, putting it into a system, a garage system, that has to be tailored to the individual use of the homeowner. And that's precisely what we have testimony during trial. You know, Dyer talks about this being up to the contractor and the end user, how these things fit together. That's at line 37, page 20. So that's exactly what we have here. I think the car and the windshield example is spot on for us. Rios, which is talked about a lot, that's a case that dealt with the item itself, that it was a product that was produced. It was an integrated part of the product as a safety device. So we're not talking about some separate safety device like the bicycle helmet or the TMV. I also want to clarify, just for the record, there was some reference to what exactly the different hot means versus warm and so forth. Looking at the instructions that are provided in the manual, again, this was proper but not allowed to go before the jury, and I'll have to focus a little here, but it shows the 120 bar being above the word- Wasn't the instruction manual given to the jury? The instruction manual was not given to the jury, Your Honor. No, it was precluded by motion eliminating. But I'm looking at it now, and it shows that the 120 bar is above warm and below hot. 130 is in between. So the notion that the 120 sky bar was on vacation is simply incorrect. A couple other quick points. No, the demonstrative was not feasible, Your Honor, and it was not feasible not only because it was even though they used piping, I mean, it was still close to the-so close, hugging the tank, that the ambient heat from the tank would actually flow off. That was the testimony during trial. And so here's what I think, to step back a moment, what happens. You have a product whose nature and function, in the word of this court in Fuller, is to produce hot water and introduce it into a stream in the same way that an electrical generator, to make this point more brief, introduces electricity into the home. And then you have all kinds of things that occur thereafter that are tailored to the home and to the uses of the consumer. And they're not within the control of the hot water manufacturer. Indeed, this would be the first case recognizing a duty that is not in the hands of the hot water manufacturer. These things are done elsewhere. And you have antistatic devices tailor-made to avoid what happened here, but they're far away. They are, by nature, at the fixture. And so what the theory here was is, well, let's look at something that typically, that our own expert says the CMV can be anywhere in the piping. You take something that's typically located closer to the water heater, and let's say that that is really just part of the water heater, and try to convince a jury that that's the case. And you do that by introducing a demonstrative that actually shows it physically connected, even though that's not workable. And then that doesn't work. You say, well, it can go anywhere, but it still has to be in the box. And so you're taking something that's not designed for this purpose. You're saying it tends to be proximate, and so perhaps we can say it's all part of the same device. But, again, that's inconsistent with the way the courts have treated the case law. I would like to look just specifically, Your Honors, at the special inter-auditory. They sort of re-briefed the case of Erickson as an example of how you're supposed to avoid ambiguity and confusion, and you are supposed to avoid ambiguity and confusion. But if you look at Erickson, what happened there is the word guilty was introduced in a civil case used as part of the inter-auditory. And the court correctly concluded, in a completely unsurprising result, that guilty is a criminal concept. It suggests a higher burden of proof, and it's probably going to mislead jurors to think that they have to satisfy something beyond, I believe, clear and convincing was the evidentiary standard at issue in that case. To be sure, that's the kind of confusion that can create a problem here. There's nothing about this instruction that would sow confusion in the minds of jurors. Indeed, this notion that jurors should start to think about this as part of a broader system, that's precisely why it was such a critical question to ask, because it touches upon everything we've been talking about today. The Rosser case in the Fourth District talks about items that are, quote, not themselves inherently dangerous or defective but can become potentially dangerous when integrated into a unit designed, assembled, installed, and sold by another. Those are the things to which strict liability does not apply. And so if Prentiss is correct that the jurors would have concluded that this becomes dangerous only as assembled and installed, and the other words that Rosser uses, then we should not have found liability in this case. Indeed, it goes precisely to what is at issue here. The opponent suggests that the interrogatory should have read, it was unreasonably dangerous without the TMD when it left the manufacturer. Well, there was no dispute. I think she made this point. There's no dispute as to how it left the manufacturer. No one was claiming a dispute of fact. Well, in fact, there was one in there. This was really a Polaris model, for example. That was just never an issue. Which is the ultimate issue then? Did it left how it was or without the TMD? Well, their position would be that it was an inherently dangerous product without the TMD. There was no dispute that there was no TMD. And so as read, as written, I think it captured precisely the core question in the case. And I can refer you, Your Honor, to volume 36 at page 142. Here is the only statement. It's three lines from the court. That's not a specific stated element of the current burden of proof instruction. It's refused. That is the sum total of the court's analysis with regard to the special interrogatory, Your Honor. And the word condition, that was, as we extend in our brief, there's no question that would have introduced yet ambiguity. That was not a defined term, to my knowledge, in the instructions. And therefore, you would have been introducing something that the jurors were unfamiliar with at that point. I guess I'll close, unless there are, of course, other questions. Just a very brief comment, Your Honor's question about foreseeability and whether it should have been set as an affirmative defense. Foreseeability is an element that was in the jury instructions. The defendants ought to have been free to argue anything in opposition to showing the foreseeability in this case. Thank you. Thank you, Your Honor. All right. The court will take the matter under its license. And with that, we have no further cases today, so the court will stand in recess.